UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN GREENWALD

              Plaintiff,                    Case No. 04-40071

vs.

                                          Honorable Paul V. Gadola
                                          Honorable Steven D. Pepe

LIFE INSURANCE COMPANY
OF NORTH AMERICA

              Defendant.

_____/

**REPORT AND RECOMMENDATION**

        Plaintiff brings this action under the Employment Retirement Income Securities Act (ERISA) alleging that Defendant wrongfully denied him long-term disability (LTD) benefits to which he was entitled.

        Defendant's Motion To Affirm Administrator's Decision (Dkt. # 17) and Plaintiff's Motion To Reverse Defendant's Arbitrary And Capricious Denial Of Long-Term Disability Benefits (Dkt. # 19) have been referred to the undersigned pursuant to 28 U.S.C. § 636 (b)(1)(B).  For the reasons stated below, IT IS RECOMMENDED that Defendant's motion be GRANTED and Plaintiff's motion be DENIED.

**I.**      **BACKGROUND FACTS**

        **A.**      **Standard for Reviewable Facts**

        Congress passed ERISA to protect participants in employee benefit plans by requiring employee plans to meet minimum standards and allowing for judicial review in federal courts.  29 U.S.C. §1001(b).  Section 1132(a) allows a participant to file suit in federal court to enforce the terms of their ERISA-covered employee benefit plan.  In claims without a procedural challenge to

the administrator's decision, the Sixth Circuit has limited judicial review to "evidentiary materials contained in the administrative record." *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring) (citing *Perry v. Simplicity Engineering,* 900 F.2d 963, 966 (6th Cir. 1990)). The limitation of judicial review to the administrative record is to effectuate Congress's intent in drafting ERISA which was to create a mechanism for disposition which "does not neatly fit under either Rule 52 [Bench Trial] or Rule 56 [Summary Judgment]." *Wilkins,* 150 F.3d at 619.

Therefore, because Plaintiff is challenging his entitlement to benefits under the Defendant's LTD Plan pursuant to the terms of the Plan, but not alleging that the Plan's administrator failed to follow the Plans' procedures in reviewing his claim, the Court's review of this matter is limited to the Administrative Record.

### B. Reviewable Facts

#### *LTD Plan Provisions*

As a benefit of his employment with UBS PaineWebber Inc. Plaintiff received LTD insurance coverage. Plaintiff's LTD coverage was available under two plans -- one administered by Defendant Life Insurance Company of North America (LINA) (the LTD Plan) and another administered by UNUM Provident Disability.[1]

The LTD Plan contained the following "Pre-Existing Condition Limitation" provision:

---

[1]Plaintiff earned in excess of $740,000 annually with Paine Weber. Under the LTD Plan Plaintiff was eligible benefits in an amount up to 60% of his first $11,666 of "monthly covered earnings" and 30% of the "next $30,000 of monthly covered earnings"(R. 39). This would be approximately $25,000 per month in LTD, which exceeded the LTD Plan's monthly benefit maximum of $16,000 (*Id.*). The UNUM LTD Plan was offered to Plaintiff as a supplement so that he could collect the full $25,000 per month in the event he required LTD benefits. The UNUM LTD Plan's decision is not challenged in this matter and, although Plaintiff attached a copy to his motion, the UNUM Plan is not part of the Record.

The Insurance Company will not pay Disability Benefits for any period of Disability caused by or contributed to by, or resulting from, a Pre-Existing Condition.  A 'pre-existing condition' means any injury or Sickness for which the Employee incurred expenses, received medical treatment, care or services including diagnostic measures, took prescribed drugs or medicines, or for which a reasonable person would have consulted a physician within 3 months before his or her most recent effective date of insurance.

(R. 52).

Plaintiff's effective date of insurance was January 1, 2002 (R. 35).  Plaintiff was subject to a 180 day waiting period for benefits under the LTD Plan (R. 39).

*Records Within "Pre-Existing Condition Period - October 1, 2001 through December 31, 2001*

Plaintiff and his wife attended 2 session of marital counseling with Cathy Pietrofesa, Ph.D. on September 20 and October 1, 2001 (R. 218-19).  Plaintiff also attended several sessions of individual counseling with Dr. Pietrofesa related to his divorce and child custody proceedings.

On November 6, 2001, Dr. Pietrofesa described Plaintiff as anxious, very distressed and looking very sad (R. 217).  Plaintiff was upset about his life, missed his children and was devastated at the thought of potentially losing daily contact with them due to divorce.

On November 9, 2001, Dr. Pietrofesa described Plaintiff as acting very depressed, making poor eye contact and fidigity (R. 216).  Plaintiff had requested an extra session and told Dr. Pietrofesa that he was depressed, and did not want the divorce his wife was requesting because he wanted to remain in daily contact with his sons.

On November 13, 2001, Dr. Pietrofesa described Plaintiff as depressed looking, very sad with downcast eyes and slumped shoulders (R. 215).  Plaintiff continued to talk about his unhappiness at being separated from his children and Dr. Pietrofesa felt that there had been no progress at the end of the session.

*Records After Pre-Existing Condition Period*

On March 19, 2002, Dr. Pietrofesa described Plaintiff as very serious, intense and upset (R. 214). Plaintiff talked about his marital problems but stated that he knew "things" would work out and that he would prevail. Plaintiff was determined to be a good father and a good person but was still angry about "some things". Dr. Pietrofesa felt that Plaintiff was learning a lot about parenting and patience and was feeling good about himself.

On May 7, 2002, Dr. Pietrofesa described Plaintiff as looking better and happier and making good eye contact (R. 213). She felt that he was working hard at being a good person and at feeling proud of himself.

On June 4, 2002, Dr. Pietrofesa described Plaintiff as smiling, in good spirits and making good eye contact (R. 212). She felt he was "really genuinely enjoying his children" and making a sincere effort to be there for them and to be a good parent".

On June 18, 2002, Dr. Pietrofesa described Plaintiff as upset, agitated and distressed (R. 211). Plaintiff described problems with "a couple of people" at work and his efforts to be fair, take of their emotional needs and "motivate them to sell". Dr. Pietrofesa felt that Plaintiff was "bending over backwards" to be fair and that the divorce had made him "more willing and able to take care of people's emotional needs as well as their other needs".

On July 15, 2002, Dr. Pietrofesa described Plaintiff as extremely distressed, upset, wringing his hands and exhibiting many "nervous mannerisms"(R. 210). Plaintiff explained that he was having trouble at work because a subordinate had lodged a complaint against him for discrimination after Plaintiff had given him a bad performance review and another person had filed a sexual harassment claim against him.

4

On July 19, 2002, Dr. Pietrofesa saw Plaintiff on an emergency basis and she described Plaintiff as totally distraught (R. 209).  Plaintiff's brother brought him to the appointment and told Dr. Pietrofesa that he felt Plaintiff was suicidal, though Plaintiff denied that he was.  Plaintiff explained that he was upset because he had been demoted due to the 2 complaints that had been lodged against him.  Dr. Pietrofesa set up an appointment with a psychiatrist and contacted an internist who prescribed Efexor.  The same day, Plaintiff was evaluated by a psychiatrist, Rosalind E. Griffin, M.D. (R. 247, 250).  Plaintiff reported a long history of disintegrated functioning and an onset of symptoms in August 2001 (R. 247).  He had a fear of separation from his family and no prior history of psychiatric treatment "except as related to divorce".  Dr. Griffin found Plaintiff's mental status to be abnormal, disorientated, confused, vague, rambling, anxious and agitated. Plaintiff reported that he had been "mustering" the energy to produce that which was demanded at his job and felt betrayed and persecuted.  Dr. Griffin's diagnosis was biochemical endogenous depression.

On July 29, 2002, Dr. Pietrofesa had a telephone session with Plaintiff in which Plaintiff sounded "down" and depressed (R. 208).  Plaintiff said that he was having anxiety attacks and was feeling worthless and useless and that not working was driving him "crazy".  Dr. Pietrofesa felt that Plaintiff was very anxious and depressed.

On August 8, 2002, Dr. Griffin diagnosed Plaintiff with major depression (R. 246, 250).  His symptoms included poor sleep. depression and anxiety without panic.  Upon examination Dr. Griffin noted that Plaintiff could not formulate cogent coherent thoughts, he was confused and depersonalized and fought to hold his impulses together for the sake of his children.  She recommended that he continue taking an antidepressant.  Her treatment plan included: treat

5

symptoms of "long standing depression", focus on reducing type A personality, increase recreation activities, evaluate biochemical depression, evaluate anxiety, rule out thought disorder, return patient to employment and estimated recovery at 6-9 months. Dr. Griffin filled out a disability certificate disabling Plaintiff from work from July 19 to September 19, 2002 (R. 249). Dr. Griffin continued Plaintiff's Effexor for agitation and insomnia, but indicated that Plaintiff's mental status exam had shown evidence of "long term flight of ideas, pressured disorganized concentration and delusional grandiosity" and she suggested administering psychological testing to rule out thought versus a mood disorder (R. 248).

On August 20, 2002, Dr. Pietrofesa described Plaintiff as looking depressed and sad, sitting with bowed head and very little movement (R. 207). She opined that Plaintiff was struggling with "who he is" and his competency.

On August 26, 2002, Dr. Griffin noted that the medications Plaintiff was taking were not effective, as Plaintiff reported he could not function (R. 246). Plaintiff was tearful and reported a poor appetite and motor retardation as well as fear and nightmares. Dr. Griffin changed his anti-depressant medication and added an anti-anxiety medication.

On August 27, 2002, Dr. Pietrofesa described Plaintiff as looking very serious and depressed (R. 206). Plaintiff described having nightmares about losing his job.

On September 3, 2002, Dr. Pietrofesa opined that Plaintiff appeared depressed and distressed, gave intermittent eye contact and exhibited a lot of nervous mannerisms (R. 205).

On September 10, 2002, Dr. Pietrofesa writes that Plaintiff is: having "a very bad day", looked very down, seemed agitated, upset and near tears (R. 204). Plaintiff discussed everything that had "happened to him in the last year" including that fact that he had not wanted to be divorced,

6

he had lost the job he loved and he only had his children "a little bit of the time". He commented that he could not believe his life had "fallen apart this way". Dr. Pietrofesa felt that Plaintiff was really trying to look ahead and be more positive but that it was a struggle for him.

On September 17, 2002, Dr. Pietrofesa described Plaintiff as really down, fidgety, very distressed, upset and anxious with poor eye contact (R. 203). Plaintiff refused to take the medication he had been prescribed, although Dr. Pietrofesa urged him to do so.

On September 23, 2002, Plaintiff saw Dr. Griffin and she reported no change (R. 243).

On September 24, 2002, Dr. Pietrofesa described Plaintiff as a little better, a little "brighter", with a forced smile (R. 202).

On October 1, 2002, Dr. Pietrofesa indicated that Plaintiff was "not doing well". Plaintiff indicated that he had obtained a new prescription for an anti-depressant and was taking this medication.

On October 7, 2002, Dr. Pietrofesa described Plaintiff as anxious, intense and very serious (R. 200). Plaintiff stated that he had experienced a panic attack, was feeling out of control and having nightmares. Dr. Pietrofesa suggested that he ask his psychiatrist for Xanax for the panic attacks, and described Plaintiff as compliant "doing all he can to feel better". Plaintiff also Dr. Griffin on October 7 (R. 240-42). Plaintiff reported that his mind was racing and he could not concentrate (R. 241). He had a lack of energy and suffered an anxiety attack (R. 242).

On October 15, 2002, Dr. Pietrofesa described Plaintiff as looking better and not quite as anxious, but still very distressed (R. 199). Plaintiff reported that he was still feeling anxious, though the anti-anxiety medication had helped it to subside somewhat and he had not had an anxiety attack in a week. He could not stop thinking about work and the loss of the job he loved. He agreed

to continue taking his medication despite side effects.  Dr. Pietrofesa ascertained that Plaintiff was not suicidal, but was somewhat numbed by his medication.

On October 23, 2002, Dr. Pietrofesa described Plaintiff as looking depressed and extraordinarily anxious, in need of a haircut, very casually even sloppily dressed, with difficulty concentrating and intermittent eye contact (R. 198).  Plaintiff reported anxiousness and difficulty sleeping and concentrating.  He felt frightened and felt that his company was "really going after him".  Dr. Pietrofesa reported that Plaintiff had made no progress.

On October 31, 2002, Dr. Griffin reported that Plaintiff had responded to the Lexapro, but still felt suicidal (R. 239).  She opined that his depression has a severity of symptoms which appeared to be schizoaffective.  She ordered an MMPI test to determine if he had sufficient objective evidence "which makes him refractory to current anti depressant therapy course".  Plaintiff remained psychomotor retarded "alternating with grandiose expansive thinking" and lowered self esteem.

On November 4, 2002, Dr. Pietrofesa described Plaintiff as looking awful, with long hair, a rumpled and disheveled appearance; looking "down in the dumps", very sad and distressed and agitated; and further stated that he could barely sit still and was in constant motion during the entire session (R. 197).  Plaintiff indicated that he was "going nuts" because he had nothing to do and felt conflicted about keeping up with the stock market and clearing his name.  Dr. Pietrofesa felt that Plaintiff was being compliant with medication and attempting to keep himself functioning.

On October 18, 2002, Dr. Pietrofesa described Plaintiff as looking terrible and very depressed (R. 196).  Plaintiff reported having a really hard time, was extremely depressed and went through periods where he could not sleep.  He missed his old job and his old life and was deeply depressed.  Dr. Pietrofesa reported no progress.

8

On November 11, 2002, Dr. Griffin diagnosed Plaintiff with major severe depression, panic disorder and a Global Assessment of Functioning (GAF) of 30 (R. 236).[2]

On November 25, 2002, Dr. Griffin reported that Plaintiff was taking Lexapro and was still emotionally depressed, anxious and having nightmares but was able to examine options and choices (R. 237).  Plaintiff reported feeling all alone and explained that he had transferred to the area from St. Louis and did not know anyone but his family and co-workers (who he felt were his family and friends).  Dr. Griffin noted that there was no family history of bipolar disorder and that the present illness had an onset of August 2001.  Dr. Griffin's diagnosis was major depression with anxious mood and a GAF of 50.[3]

On December 9, 2002, Dr. Griffin reported that Plaintiff's symptoms had severely deteriorated over the last 6 months and his adjustment disorder had exacerbated (R. 233).  She opined that his loss of interest in all activities of daily living made it impossible to perform his work duties.  She indicated that his previous diagnosis of "300.4" had "disintegrated to ...296.24" (R. 233), which she indicates is a emotional disability disorder biochemical imbalance (R. 232).  Nonetheless

---

[2]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30.  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32.  A GAF score of 30 - 21 indicates behavior that "is considerably influenced by delusions or hallucinations OR serious impairment in communications or judgment (e.g. sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g. stays in bed all day; no job, home or friends)."

[3]A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30.

she gave him a GAF of 50 (R. 233) and indicated that he could return to work on February 25, 2003 (R. 232). Dr. Griffin wrote in her notes that Plaintiff had no evidence of inability to complete work tasks prior to July 2002 (R. 231). She also indicated that biochemical depression preceded the onset of the June 2002 depression, and that Plaintiff saw Dr. Pietrofesa related to divorce, parenting and children's best interest issues and not related "to any disability or biochemical symptoms".

A note in Dr. Griffin's file from December 16, 2002, indicates that Plaintiff's MMPI test results were interpreted to show "extreme psychotic depression" which would totally disable a person (R. 230). The author indicated that the results were either a "faked bad profile" or the person would be in the hospital, as they would "not be able to function" if the profile were valid.

On January 6, 2003, Dr. Pietrofesa reported that Plaintiff once again looked terrible, was dressed in "a messy way", his hair was long and looked disheveled and seemed very depressed (R. 195). Plaintiff reported that he was really struggling, very depressed, could not concentrate or focus, thought about his job all the time, had nightmares about his job, was very anxious and insecure and lacked confidence.

On January 9, 2003, Dr. Griffin indicated that Plaintiff's MMPI was consistent with psychosis and biochemical depression (R. 227). Plaintiff explained that he had come to Detroit in 1999 after a promotion. He received another promotion in July 2001, and was moved to the New York office in August. He recalled feeling disorientated, dysfunctional and not being able to comprehend reality and stated that he developed compensatory management skills to stay on task. He indicated that his divorce had no influence on his emotional status and that he stayed and put all his energy into his job.

On January 13, 2003, Dr. Pietrofesa felt that Plaintiff had not made progress and had, if

10

anything, "gone backwards".

On January 20, 2003, Dr. Pietrofesa reported that Plaintiff looked terrible with longer hair and a disheveled and downcast look and anxiety (R. 193). Plaintiff indicated that he "could barely stand himself" and did not like the way his life was going. He could not focus due to anxiety and was feeling depressed. He stated that he could not understand how his life fell apart this way referring to his marriage and his job, though he indicated that his job loss played a greater role than the marriage ending in what had "driven him over the edge". Dr. Pietrofesa reported no progress.

*Procedural History*

Plaintiff applied for LTD benefits in November 2002 (R. 2), alleging disability due to depression that started on July 19, 2002 (R. 318). Plaintiff indicated in his application that he intended to return to work on January 30, 2003 (*id.*).

On March 19, 2003, Plaintiff's claim was denied pursuant to the pre-existing condition provision in the LTD Plan. Defendant LINA determined that Plaintiff had been "treated for symptoms of long standing depression since as far back as August of 2001" (R. 173). Defendant LINA stated that:

> During the pre-exisitng period of 10/1/01 - 12//31/01, you r medical records indicate that you had 2 sessions of marriage counseling (on 9/20/01 & 10/1/01) and 3 sessions of individual therapy (on 11/6//01, 11/9/01 & 11/13/01) with therapist Cathy Pietrofesa. During your individual therapy, you were noted to be "very anxious, distressed and sad". In addition on 11/19/01, your therapist observed that you were "acting very depressed", and she also noted that you requested and (sic) extra session because you were depressed.
>
> We also have treatment notes from Dr. Griffin dated 7/19/02 in which she states that the onset of your depressive symptoms started back in August of 2001, and that you had a long history of disintegrating functioning. Additionally, on 8/8/02 it was noted that your Master Treatment Plan was to 'treat symptoms of longstanding depression'.
>
> .... We have determined that you stopped working due to Major Depression. In addition your records indicate that you have had a longstanding history of

11

depression with an onset of signs and symptoms for this condition as August 2001. Although your stressors appeared to be marital/family issues which led to signs and symptoms of depression during the pre-existing period, retrospective view from your doctors indicate an onset of these signs and symptoms as August 2001. Regardless of the specific stressors, you exhibited signs and symptoms of depression, and you were noted to have had an adjustment disorder that exacerbated to Major Depression. A review of these treatment records confirm that you were treated during the preexisting period for a condition which was caused by, contributed to or resulted from the condition for which you are now claiming disability.

(R. 124).

Plaintiff appealed this decision in a letter dated June 30, 2003 (R. 159). Enclosed with this letter were correspondence from Drs. Pietrofesa and Griffin supporting Plaintiff's appeal (R. 161, 163). In her letter Dr. Pietrofesa called the contention that Plaintiff had a pre-existing condition "false" and also stated that her records did not indicate that he had a "long standing depression" as had been alleged (R. 161). She went on to say that Plaintiff had come to her for marriage counseling and continued therapy with her when it was clear the marriage would end. She agreed that he was diagnosed with Dysthymia, but stated that it did not effect his functioning, job performance or relationships with family and friends. It was not until after his demotion that Plaintiff exhibited "any classic symptoms of depression" and it was only after this that Plaintiff was "truly devastated" and had to have medication (R. 162). Specifically, Dr. Pietrofesa states: "the depression ...was not in evidence until after his demotion on July 19, 2002". In her letter Dr. Griffin indicated that Plaintiff suffered from major depression as of July 19, 2002, and that his past medical history showed no evidence of a psychiatric disorder (R. 163-64). She explained that there was no evidence of a biochemical imbalance during his parental counseling related to child custody issues or marital therapy (R. 164). His reaction at that time was a "benign, mild" reaction common to ordinary life stressors. She contrasted this with his then current condition which she felt caused him to be disabled from his job.

12

Defendant LINA hired a third-party evaluator, Theodore Pearlman, M.D., to interview Drs. Griffin and Pietrofesa and review their treatment notes (R. 93). On December 9, 2003, Dr. Pearlman opined that Dr. Griffin's opinion that Plaintiff's "pre-demotion depressive symptoms and his post-demotion severity of mental illness" were distinctly separate illnesses was based on an "antiquated differentiation" between reactive and endogenous depression (R. 70). "Current psychiatric teaching takes the position that depression, whether it is Dysthymic or Major Depression, may be mild, moderate or severe..... Patients are sometimes diagnosed as having 'double depression', that is (sic) features of both Dysthymic and Major Depression". Dr. Pearlman also disagreed with Dr. Griffin's opinion that Plaintiff's feelings  people were against him were based on a psychosis and opined that these were realistic feelings given the reality of the circumstances surrounding Plaintiff's demotion. Plaintiff's involvement with his children and listing of his symptoms did not support a finding of psychosis (R. 70), and his MMPI-II test "emphasizes a question of invalidity" (R. 71). Dr. Pearlman felt that the record and his discussions with Drs. Griffin and Pietrofesa supported a finding that prior to Plaintiff's demotion he experienced "mild-to-moderate depression manageable by counseling alone" and subsequent to his demotion there was an increase in the severity of depression. He found "no merit" in Dr. Griffin's argument that Plaintiff's "depression following July 20, 2002 was completely independent of prior psychopathology". Dr. Pearlman also found no support for Plaintiff's alleged disability beyond August 1, 2002 (R. 71).

On December 12, 2003, Defendant LINA denied Plaintiff's appeal in reliance, in part, upon Dr. Pearlman's opinion that (a.) the "deterioration of [Plaintiff's] condition at the time he was demoted was actually a quantitative worsening of the pre-existing depression, caused by ... increased stress of the demotion" (R. 89) and (b.) the medical information did not support Plaintiff being off

work more than 7-10 days (R. 90). Defendant LINA indicated that it had reviewed the "claim file, information submitted on prior appeals and Dr. Pearlman's report" and concluded that the treatment Plaintiff received for depression in the pre-existing condition or pre-demotion period was related to his increased depression resulting from his demotion (R. 91). Because this "underlying depression at least contributed" to Plaintiff's claim of disability and was treated in the pre-existing condition period, it satisfied the LTD Plan's definition of a pre-existing condition. Further the information reviewed did not support a claim that Plaintiff was continuously unable to perform his duties for the 180 day waiting period prescribed under the LTD Plan. For these reasons Plaintiff's appeal was denied and this exhausted all appeals under the LTD Plan.

On January 26, 2004, Dr. Griffin wrote a letter in response to Dr. Pearlman's report in which she disagreed with his opinion that Plaintiff's disability fit within the LTD Plan's Pre-Existing Condition provision (R. 78-79). She explained that Plaintiff's pre-demotion counseling was precipitated by a recommendation made in the best interest of the children during his divorce and that he had not required a psychiatrist or psychotropic medication and did not have "suspension of his ability to concentrate and sleep", all of which he had post-demotion (R. 78). "Any reference to 'depression' does not intend to diagnosis (sic) a clinical state requiring medical manipulation.... [and] apparently was used to describe an affect not a sustained mood." She explained that a sad or depressed feeling is a normal reaction when dealing with divorce. She opined that Plaintiff's Major Depression in July 2002 was distinctly separate and differentiated from the divorce and parental guidance counseling in 2001 (R. 79). She pointed out that the DSM-IV set forth a 6 month timeline for normal adjustment to a life stressor such as divorce and indicated that Plaintiff's divorce required a normal adjustment phase, but did not support a finding of a pre-existing condition.

14

Defendant LINA responded to Dr. Griffin's letter by reiterating its decision and indicating that Plaintiff had exhausted his appeals under the LTD Plan (R. 80).

## II.   LEGAL ANALYSIS

### A.   Standard for Judicial Review of Plan Administrator's Actions

A Court will review the Plan Administrator's decision *de novo* unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When there is a "clear grant of discretion to the administrator," courts defer to the Administrator's decision, reviewing it only to see if it was arbitrary and capricious. *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 984 (6th Cir. 1991); *Brown v. Ampco-Pittsburgh Corp.,* 876 F.2d 546, 550 (6th Cir. 1989).[4]

In the present matter, the parties agree that the LTD Plan grants discretion to the Administrator and that the arbitrary and capricious standard is appropriate (Dkt. # 19, p. 11; #17, p. 1).

"[T]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir.2000)(internal citations and quotations omitted).

### B.   Denial of Benefits Pursuant to the Pre-Existing Condition Limitation

---

[4] Yet, a plan is not required to use the term "discretionary" or some other similar terminology. See *Johnson v. Eaton Corp.*, 970 F.2d 1569, 1572 n. 2 (6th Cir. 1992).

It is undisputed that Plaintiff's effective date of insurance under the LTD Plan was January 1, 2002, and therefore, his pre-existing condition period would have been October 1 through December 31, 2001 (Pre-Existing Condition Period).

As noted above, the LTD Plan's Pre-Existing Condition Limitation provision dictates that the LTD Plan will not pay benefits for (a.) any period of Disability caused by or contributed to by, or resulting from, (b.) any injury or sickness for which the employee incurred expenses, received medical treatment, care or services including diagnostic measures, took prescribed drugs or medicines, or for which a reasonable person would have consulted a physician within 3 months before his or her most recent effective date of insurance (R. 52).

Defendant LINA argues that Plaintiff's LTD benefit claim was negated by the fact that the alleged depression stemming from his divorce, for which he sought treatment, care or services during the pre-existing condition period in the form of counseling with Dr. Pietrofesa, contributed to the Major Depression that supported the LTD claim.

Plaintiff and his treators do not dispute that he was diagnosed with Dysthmia during the Pre-Existing Condition Period, but argue that this was unrelated to his Major Depression, not a debilitating condition and not treated after November 13, 2001 (R. 161-62; Dkt. # 19, p.5-6).  They also argue that he did not seek treatment for Dysthmia, but rather participated in counseling during the Pre-Existing Condition Period to (a.) satisfy a recommendation in his child custody proceedings (R. 78 ) and (b.) to learn more about himself and become a better person when it became clear his marriage would end (R. 161).

Whether or not the alleged depression Plaintiff experienced during the Pre-Existing Condition Period was debilitating and/or cured is not a material issue.  The LTD Plan does not limit

qualifying pre-existing conditions only to those that caused an employee to be unable to perform their job, nor does it require that the condition be similar in nature or scope to the condition that caused disability in order to be considered pre-existing. In fact, any sickness that contributed to the disability fits the LTD Plan's definition of a pre-existing condition -- provided the injury was one which caused the employee to incur expenses or receive medical treatment, care or services (R. 52).

It is undisputed that Plaintiff participated in counseling with Dr. Pietrofesa prior to and during his divorce (during and after the Pre-Existing Condition Period), in the form of marital and individual counseling sessions. In Dr. Pietrofesa's notes there are many examples of Plaintiff being described as sad and depressed. And even though Dr. Pietrofesa explains that these were merely descriptors and not clinical diagnosis, she admits that Plaintiff was diagnosed with Dysthmia (R. 161). On November 9, 2001, Dr. Pietrofesa described Plaintiff as acting very depressed and noted that Plaintiff had requested an extra counseling session apparently because of his depression (R. 216).

Further, the Pre-Existing Condition Period ended on December 31, 2001. Yet, as late as May 7, 2002, Dr. Pietrofesa remarked in her notes that Plaintiff was doing better but still did not want the impending divorce (R. 213). In August 2002, Plaintiff indicated that he was still struggling with the idea of not seeing his sons as often as he wanted (R. 206, 207). In September 2002 he stated that he was lonely without his sons and described his life as having fallen apart with the divorce and loss of his job (R. 204, 205). Although he stated that the job loss affected him more than the divorce, he still described the divorce as part of his problems in January 20, 2003 (R. 193). Also, on more than one occasion Dr. Griffin's notes describe the "history of present illness" as having an onset in August 2001 (R. 163, 237, 247), and she indicated in her August 8, 2002, treatment plan that

17

Plaintiff had "symptoms of a long standing depression" (R. 250).

Plaintiff's visits with Dr. Pietrofesa during the Pre-Existing Condition Period would undoubtedly qualify as care or services under the LTD Plan -- so the only question is whether Plaintiff's Dysthmia during the Pre-Existing Condition Period caused, contributed to, or resulted in the disabling Major Depression he suffered after losing his job.

Plaintiff and his treators do not provide a definitive answer on the subject of whether Plaintiff's pre-demotion depression could at least have contributed to the disabling Major Depression and therefore fit the definition of a pre-existing condition under the LTD Plan. They concentrate on differentiating the pre- and post-demotion depression. They argue that Plaintiff experienced normal sadness or depressed feelings when adjusting to his divorce in the pre-existing period and that the post-demotion depression was quite different because it caused him to be unable to function properly (R. 78). Yet, as explained above, this is not the end of the inquiry. If the pre-demotion depression even contributed to the post-demotion Major Depression, then the Pre-Existing Condition Limitation provision would exclude payment under the LTD Plan.

Dr. Pearlman read Plaintiff's records and interviewed Drs. Griffin and Pietrofesa (R. 66). He concluded that Plaintiff's pre-demotion depression, present during the pre-existing condition period, was managed through counseling and progressed to a new level of severity after the demotion (R. 70). He found "no merit" in Dr. Griffin's argument that Plaintiff's post-demotion depression was "independent of prior psychopathology".

Plaintiff argues that Dr. Pearlman's opinion should have been discounted in favor of Plaintiff's treators (Dkt. # 15-20). Plaintiff concedes that the so called "treating physician rule" has been overruled by *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), but asks that the

18

Court use "common sense and equity" and rule that the treating physician's opinions in this case should have been weighed more heavily than Dr. Pearlman because Dr. Pearlman never examined Plaintiff and may even be biased due to the fact that he was hired by Defendant LINA.

The Sixth Circuit has observed that a plan administrator hiring an independent expert is:

> operating under a conflict of interest that provides it with a 'clear incentive to contract with individuals who were inclined to find in its favor that [a claimant] was not entitled to continued [disability] benefits.' *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 292 (6th Cir.2005) (noting that the "possible conflict of interest inherent in this situation should be taken into account as a factor in determining whether [a plan administrator's] decision was arbitrary and capricious") (quotation marks omitted). Thus, although 'routine deference to the opinion of a claimant's treating physician' is not warranted, we may consider whether 'a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled'" as a factor in determining whether the plan administrator acted arbitrarily and capriciously in deciding to credit the opinion of its paid, consulting physician. *See Nord,* 538 U.S. at 832, 123 S.Ct. 1965.

*Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 507-508 (2005)(6th Cir. 2005).

Yet, in the present case, other than the fact that he was hired by Defendant, Plaintiff has not offered any other evidence of bias with regard to Dr. Pearlman.[5]  The *Kalish* Court stated that conclusory allegations of bias would not suffice to support such an argument.  *Id*.[6]

Whether a doctor has physically examined the claimant is a factor that may be considered

---

[5]Plaintiff does allege that Dr. Pearlman's "primary objective" of disproving Drs. Griffin and Pietrofesa was evident from his statement that Plaintiff's MMPI profile was either invalid or indicative of extreme pathology (Dkt. # 19, p. 7).  Yet a notation in Dr. Griffin's file with respect to the MMPI states this same conclusion (R. 230).  Therefore, this does not provide sufficient evidence of bias.

[6]The *Kalish* Court held that the plaintiff's failure to "present any statistical evidence to suggest ... [ the reviewer] has consistently opined that claimants are not disabled" left the Court "unable to conclude on this basis that [Defendant] acted arbitrarily and capriciously in deciding to credit the opinion of" the reviewer over the treating physician.  *Kalish* at 508 (citing *Nord,* 538 U.S. at 832, for the proposition that "a treating physician, in a close case, may favor a finding of 'disabled' ").

when determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician. Yet "reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) ("[W]e find that the failure to conduct a physical examination ... may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."). In fact, there is a general rule that "when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious". *McDonald v. Western-Southern Life Insurance Co.*, 347 F.3d 161, 169 (6th Cir. 2003).

The issue of whether or not Plaintiff's pre-demotion depression fell within the Pre-Existing Condition Limitation provision of the Plan appears to be a difference of medical opinion. Relying on Plaintiff's own medical records Dr. Pearlman opined that Plaintiff's pre-demotion depression must be considered to have escalated into his post-demotion depression and he discounts as antiquated Dr. Griffin's argument that Plaintiff, or any patient, could have two different and unrelated diagnosis.[7] Dr. Pearlman's opinion suggests certain psychiatric theories reject decoupling the relation of a patient's depressions by labels applied to them. He concluded that Plaintiff's pre-demotion "marital " depression, which was "mild to moderate" and managed by counseling alone, was not completely independent of the subsequent major depression (R. 71). His notation that there

---

[7]By way of explanation -- this is not a case where a treating physician has said claimant's arm pain was caused by trauma damage to the muscle and the reviewing physician, looking only at the claimant's chart, has said the claimant's arm pain is from a pre-existing neurological disorder. There physical examination would enhance the treator's opinion. Here, instead, the doctors apparently agree on the final diagnosis (though not on the extent of disability) but disagree as to the underlying factors contributing to it. Disagreements over causation are less dependant on examination than disagreement over the condition.

is a "blurred boundary between what is diagnosed as Dysthymic Depression and Major Depression" (R. 70) supports his conclusion that Plaintiff's "pre-demotion emotional illness differs from his post-demotion emotional illness only quantitatively" (R. 71). While Plaintiff's treators assertion that the former was more reactive and the latter related to a biological abnormality and chemical imbalance might have been accepted by the fact-finder, the state of the record, indeed the limits precise diagnostic tools, are such that this Court cannot say it is arbitrary and capricious to reject such opinions. On this record a reasonable fact-finder could find that Plaintiff's mild depression in the period of October 1 through December 31, 2001, was a condition that contributed to Plaintiff's Major Depression in mid-2002..

Defendant LINA's choice to rely on Dr. Pearlman's opinion with regard to the question of whether Plaintiff's disabling depression was contributed to by a pre-existing minor depression, therefore, cannot be said to have been arbitrary and capricious, because it simply relied on the opinion of one medical doctor over another. There was evidence in the record to support Defendant LINA and Dr. Pearlman's contention that Plaintiff's pre-demotion Dysthmia at least contributed to his post-demotion Major Depression - e.g. the above-referenced treatment notes from Dr. Griffin indicating that Plaintiff suffered from long-standing depression with symptoms starting in August 2001, and Plaintiff's comments to Dr. Pietrofesa after the Pre-Existing Condition Period expired regarding the similar symptoms of his continued loneliness and sadness about his divorce and lack of time with his sons.

In sum, Defendant LINA's decision in finding that Plaintiff had a pre-existing condition, as defined by the LTD Plan, cannot be held to be arbitrary or capricious because "...when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not

21

arbitrary or capricious." *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir.2000)(internal citations and quotations omitted).

## II.   RECOMMENDATION

Therefore, for the reasons stated above, IT IS RECOMMENDED that Defendant's motion be GRANTED and Plaintiff's motion be DENIED.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.   The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.   The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: March 29, 2006                          s/Steven D. Pepe
Ann Arbor, Michigan                            United States Magistrate Judge

<u>Certificate of Service</u>

I hereby certify that a copy of this Report and Recommendation was served upon the attorneys of record by electronic means or U. S. Mail on March 29, 2006.

s/William J. Barkholz
Courtroom Deputy Clerk